# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : <br> : <br> **v.** : <br> : <br> **CHIN HUA HUANG, also known as** : <br> **JINEE HUANG,** : <br> : <br> **DES INTERNATIONAL CO.,** : <br> **LTD., and** : <br> : <br> **SOLTECH INDUSTRY CO., LTD.,** : <br> : <br> **Defendants.** : <br> : | Case: 1:20-mj-00225 <br> Assigned to: Judge Zia M. Faruqui <br> Assign Date: 11/10/2020 <br> Description: COMPLAINT W/ARREST WARRANT |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Special Agent Marcus J. Sexton, being duly sworn, hereby state as follows:

### INTRODUCTION

1. I make this affidavit in support of a criminal complaint charging Chin Hua Huang, also known as Jinee Huang ("HUANG"), Des International Co., Ltd. ("DES"), and Soltech Industry Co., Ltd. ("SOLTECH"), with knowingly and willfully conspiring to cause goods that originated in the United States to be exported and shipped to Iran without a U.S. government license, in violation of 18 U.S.C. § 371 (conspiracy to defraud the United States), 50 U.S.C. §§ 1701-1706 (the International Emergency Economic Powers Act, or "IEEPA"), and 31 C.F.R. Part 560 (the Iranian Transactions and Sanctions Regulations, or "ITSRs").

2. I have been a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), since 2002. I am currently assigned to investigate matters involving export and counter-proliferation offenses. As a result of my training and experience, I am familiar with tactics and methods used by individuals

and business organizations that engage in export and counter-proliferation violations.

3. The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in the investigation, on documents I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the criminal complaint and the requested arrest warrant, and does not set forth all of my knowledge about this matter.

4. Unless otherwise stated, the facts alleged occurred during the time period of October 2011 through May 2018.

## JURISDICTION

5. This Court has jurisdiction to issue the requested arrest warrant because acts or omissions in furtherance of the criminal offense occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## UNITED STATES SANCTIONS ON IRAN

6. IEEPA authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

7. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national

emergency to deal with that threat." On May 6, 1995, the President issued Executive Order No. 12959, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran, of any goods, technology, or services from the United States or U.S. persons, wherever located. This included persons in a foreign country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The most recent continuation of this national emergency was executed on March 12, 2020. 85 Fed. Reg. 14731 (Mar. 13, 2020). Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Effective October 22, 2012, the Department of the Treasury renamed and reissued the Iranian Transaction Regulations as the Iranian Transactions and Sanctions Regulations ("ITSRs").

8. Pursuant to 50 U.S.C. § 1705, it is illegal to willfully violate, attempt or conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA.

### INDIVIDUALS AND BUSINESS ORGANIZATIONS

9. DES was a business organization located in Taiwan. DES procured goods for the benefit of Iranian government entities and business organizations, including goods that originated in the United States. DES purchased goods from business organizations throughout the world and caused those goods to be shipped to its customers located in Iran. DES's operations included affiliates and related business organizations located around Asia and the Middle East.

10. SOLTECH was a business organization registered in Brunei, that utilized an address in Hong Kong and was operated by DES employees in Taiwan. SOLTECH was affiliated with DES by virtue of common directors, employees, and customers. SOLTECH purchased goods from business organizations throughout the world, including goods that originated in the United States, and caused those goods to be shipped to its customers located in Iran.

11. The IRANIAN ENTITY was an organization located in Iran that operated as a research center in the field of electronics standards testing. The IRANIAN ENTITY was a customer of both DES and SOLTECH.

12. HUANG was an individual who resided in Taiwan. HUANG operated as a sales agent of both DES and SOLTECH. HUANG used e-mail addresses associated with both DES and SOLTECH to communicate with providers of goods and customers, including the IRANIAN ENTITY. HUANG received compensation for her work as a sales agent of both DES and SOLTECH. HUANG reported regularly to owners and directors of both DES and SOLTECH, and her work as a sales agent in the scope of her employment benefited those business organizations in the form of revenue generation.

13. U.S. COMPANY 1 was a business organization located in the United States that functioned as a global manufacturer of electronic instruments and electromechanical devices.

14. U.S. COMPANY 2 was a business organization located in the United States that created and sold cybersecurity software.

15. The United States Department of the Treasury was a federal government agency located in Washington, D.C. Through its Office of Foreign Assets Control ("OFAC"), also located in Washington, D.C., the United States Department of the Treasury administered and enforced economic and trade sanctions against certain foreign countries, including Iran, as well as

individuals and entities associated with those countries. OFAC was empowered to grant or deny license applications for the export or re-export of U.S. goods to Iran.

## THE CRIMINAL CONSPIRACY

16. Starting in or about November 2011 at the latest, HUANG conspired and agreed with DES, SOLTECH, and the IRANIAN ENTITY to knowingly and willfully violate United States sanctions by causing goods, including a power amplifier and related components and cybersecurity software, to be exported from the United States and shipped to Iran without a license.

### Power Amplifier and Related Components

a. On or around November 4, 2011, HUANG provided to agents of the IRANIAN ENTITY purchase information for a power amplifier for use in electromechanical devices (the "Power Amplifier"), along with a power source and related components. HUANG included information that some items originated in the United States. HUANG utilized her DES e-mail address and operated as an agent of DES throughout the business transaction, including by sharing developments with directors and other employees of DES.

b. On or around December 2, 2011, an agent of the IRANIAN ENTITY informed HUANG and DES that the IRANIAN ENTITY had sent to DES a down payment for the Power Amplifier and some of the related items.

c. On or around February 21, 2012, U.S. COMPANY 1 exported a power source from the United States to Taiwan, in response to an order that had been placed by a Taiwan business organization operating as a purchasing intermediary for HUANG and DES. The power source was part of the related components of the Power Amplifier that the IRANIAN ENTITY was seeking from HUANG and DES. U.S. COMPANY 1 did not know that Iran was the ultimate destination of the power source and was misled to believe that the item would be used in Taiwan.

      d.      On or around February 13, 2012, HUANG described to an agent of the IRANIAN ENTITY that the purchase of the Power Amplifier and related components was a very difficult and risky project.

      e.      On or around March 27, 2012, HUANG informed an agent of the IRANIAN ENTITY that the goods requested had arrived in Hong Kong and that additional payment from the IRANIAN ENTITY was necessary before the goods would be released for transfer to Iran. HUANG also proposed that HUANG would change the packaging of the goods and remove the serial number, in order to minimize the risk that the items would be tracked. The serial number sticker included the phrase "Made in USA." On March 28, 2012, an agent of the IRANIAN ENTITY agreed that the packaging could be changed, but objected to removal of the serial number because the serial number would be needed for guarantee and repair. The agent of the IRANIAN ENTITY promised that the IRANIAN ENTITY would not contact the provider of the goods directly for any repairs, but would instead deal with DES.

      f.      On or around April 3, 2012, HUANG and DES caused shipment of the Power Amplifier and related components to Iran, having changed the packaging and also removed the serial number. The serial number sticker (with the phrase "Made in USA") was separately shipped to the IRANIAN ENTITY in Iran. HUANG informed other employees and directors of DES of HUANG's decision to change the packaging and remove the serial number.

      g.      On or around June 29, 2012, U.S. COMPANY 1 exported from the United States another item connected to the IRANIAN ENTITY's purchase of the Power Amplifier – this was a source amplifier that was necessary for the Power Amplifier to properly function (the "Source Amplifier"). U.S. Company 1 did not understand that the Source Amplifier was to be shipped to Iran; instead, U.S. COMPANY 1 believed that the Source Amplifier would be used in

6

Hong Kong. The Source Amplifier had been purchased from U.S. COMPANY 1 by a Taiwan business organization that operated as an intermediary purchaser for DES.

   h. On or around July 9, 2012, HUANG and DES provided to an agent of the IRANIAN ENTITY photographs of the Source Amplifier that included a serial number sticker with the phrase "Made in USA." HUANG also noted that the Source Amplifier had arrived in Hong Kong, and would be shipped to the IRANIAN ENTITY in Iran. By on or around July 16 2012, the Source Amplifier was en route to Iran via a shipping company.

   i. No license was ever sought or obtained from OFAC for the export or reexport of these items to Iran.

### Cybersecurity Software

   j. On or around December 19, 2015, an agent of the IRANIAN ENTITY asked HUANG to provide purchase information for various items of computer software. One of the requested software items was cybersecurity software developed in the United States and sold from the United States by U.S. COMPANY 2 (the "Cybersecurity Software").

   k. On or around January 30, 2016, HUANG provided to the agent of the IRANIAN ENTITY the cost of the Cybersecurity Software sold by U.S. COMPANY 2. HUANG used her SOLTECH e-mail address in all of her correspondence regarding this business transaction, and thereby indicated her operation as an agent of SOLTECH. As set forth further below, DES was the business organization that ultimately purchased the Cybersecurity Software on behalf of the IRANIAN ENTITY. Also on or around January 30, 2016, HUANG and SOLTECH inquired whether the IRANIAN ENTITY would be able to download the cybersecurity software, or if instead HUANG and her co-conspirators should download it onto a computer and send the computer to the IRANIAN ENTITY.

l. On or around February 14, 2016, an agent of the IRANIAN ENTITY confirmed that the IRANIAN ENTITY would purchase one year of access to the Cybersecurity Software, and requested that HUANG download the software onto a computer. HUANG and SOLTECH provided information to the IRANIAN ENTITY, including the name of the U.S. city where U.S. COMPANY 2 was headquartered.

m. On or around March 18, 2016, HUANG accomplished the purchase by DES of one year of access to the Cybersecurity Software. Customer contact information provided to U.S. COMPANY 2 included a DES e-mail address. HUANG used her SOLTECH e-mail address to forward the purchase information to the IRANIAN ENTITY. On or around April 4, 2016, a user identifying itself as SOLTECH downloaded the Cybersecurity Software from computer servers in the United States.

n. On or around September 27, 2016, an agent of the IRANIAN ENTITY informed HUANG and SOLTECH that the Cybersecurity Software required an update. On or around October 2, 2016, HUANG and SOLTECH provided file transfer protocol information to the IRANIAN ENTITY in order to download the software update.

o. On or around April 23, 2017, an agent of the IRANIAN ENTITY requested that HUANG and SOLTECH purchase another one-year subscription to the Cybersecurity Softare. HUANG effectuated the purchase of the Cybersecurity Software by DES. The IRANIAN ENTITY paid SOLTECH for the cost of the subscription.

p. On or around May 16, 2018, HUANG and SOLTECH sent updated purchase information to the IRANIAN ENTITY for another year of access to the Cybersecurity Software.

q. No license was ever sought or obtained from OFAC for the export or

reexport of the Cybersecurity Software to Iran.

17. As set forth above, between at least November 4, 2011, and on or about May 16, 2018, in the District of Columbia and elsewhere, HUANG, DES, and SOLTECH knowingly and willfully combined, conspired, confederated, and agreed to defraud the United States and to commit offenses against the United States, more particularly by:

    a. defrauding the United States, including the Department of the Treasury, by knowingly and willfully interfering with and obstructing a lawful government functions, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to Iran, without authoriziation or a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371; and

    b. committing offenses against the United States, by knowingly and willfully exporting, attempting to export, conspiring to export, or causing to be exported, from the United States to Iran, goods including a Power Amplifier and Cybersecurity Software without obtaining the required license or other written authorization from the Department of the Treasury, in violation of 50 United States Code, Section 1705, and 18 United States Code, Section 371.

18. The goals of the conspiracy by HUANG, DES, and SOLTECH were as follows:

    a. to purchase U.S. goods for shipment to Iran without a required license from OFAC;

    b.     to receive financial profits and other benefits from the purchase of U.S. goods for shipment to Iran without the required license from OFAC;

    c. to conceal from U.S. persons and mislead the U.S. government, including OFAC, regarding the end user, use, and destination of U.S. goods shipped to Iran without the required license from OFAC; and

    d. to evade and cause others to evade or violate the regulations, prohibitions, and

licensing requirements of IEEPA and the ITSRs.

19. It was part of the conspiracy and scheme to defraud that HUANG, DES, and SOLTECH:

    a. planned and acted outside the United States to acquire U.S. goods from inside the United States;

    b. used e-mail accounts to communicate with one another and with other individuals;

    c. caused U.S. COMPANY 1 to export goods from the United States destined for Iran;

    d. caused U.S. COMPANY 2 to export Cybersecurity Software from computer servers in the United States destined for Iran; and

    e. did not seek or obtain a license from OFAC at any time in connection with the intended export of goods from the United States to Iran, via countries outside the United States.

## CONCLUSION

20. Based on the facts described above, there is probable cause to believe that HUANG, DES, and SOLTECH conspired to defraud the United States and to violate IEEPA by causing U.S. goods to be exported from the United States, destined for Iran, without a license.

Respectfully submitted,

*[signature]*

Marcus J. Sexton
Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this __10th__ day of November, 2020.

---

HON. ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

10